FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

2021 FEB 26  PM 2: 25

MIDDLE DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al. | ) | |
| ex rel. [UNDER SEAL], | ) | |
| | ) | CIVIL ACTION NO: |
| Plaintiffs, | ) | 6:20-cv-1689-Orl-40LRH |
| | ) | |
| v. | ) | **FILED UNDER SEAL** |
| | ) | |
| [UNDER SEAL], et al. | ) | *DO NOT FILE IN PACER* |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## FILED UNDER SEAL

S-15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

UNITED STATES OF AMERICA )
AND STATE OF FLORIDA ex rel. )
STEPHEN STOOPS, M.D. )
  )
     Plaintiffs, )
  ) CIVIL ACTION NO.:
v. ) 6:20-cv-1689-Orl-40LRH
  )
HCA, INC. ) FILED UNDER SEAL
One Park Plaza ) PURSUANT TO 31 U.S.C. §
Nashville, TN 37203 ) 3730
  )
OSCEOLA REGIONAL HOSPITAL, INC. ) DO NOT SERVE
One Park Plaza )
Nashville, TN 37203 ) DO NOT ENTER ON PACER
  )
NORTH FLORIDA DIVISION I, INC. ) JURY TRIAL DEMANDED
One Park Plaza )
Nashville, TN 37203 )
  )
ORANGE COUNTY NEUROLOGY )
CLINIC, LLC )
d/b/a Brain and Nerve Center, Orlando )
4359 Hunters Park Ln. )
Orlando, FL 32837 )
  )
YASSAR CHAKFE, M.D. )
4359 Hunters Park Ln. )
Orlando, FL 32837 )
  )
LAKE CITY INSTITUTE OF )
NEUROLOGY, PA )
(d/b/a Florida Institute of Neurology – )
St. Cloud) )
4741 Old Canoe Creek Rd. )
St. Cloud, FL 34769 )
  )
NAGA LAKSHMANA P NIDADAVOLU, )
M.D. )

4741 Old Canoe Creek Rd.                    )
St. Cloud, FL 34769                         )
                                            )
NEUROLOGY CONSULTANTS                       )
CENTRAL FLORIDA, INC.                       )
820 West Oak St.                            )
Kissimmee, FL 34741                         )
                                            )
ABDUL MAMSA, M.D.                           )
820 West Oak St.                            )
Kissimmee, FL 34741                         )
                                            )
NEUROLOGICAL HEALTH                         )
ASSOCIATES, LLC.                            )
1114 Cypress Glen Cir.                      )
Kissimmee, FL 34741                         )
                                            )
FERNANDO GONZALES-PORTILLO,                 )
M.D.                                        )
1114 Cypress Glen Cir.                      )
Kissimmee, FL 34741                         )
                                            )
S.A. NEUROLOGY, LLC                         )
7376 Stonerock Cir.                         )
Orlando, FL 32819                           )
                                            )
SAIF ULLAH, M.D.                            )
7376 Stonerock Cir.                         )
Orlando, FL 32819                           )
                                            )
ADVANCED CARDIOLOGY                         )
SPECIALISTS, PA                             )
400 Celebration Place, Ste. A120            )
Celebration, FL 34747                       )
                                            )
SALAH DIN, M.D.                             )
400 Celebration Place, Ste. A120            )
Celebration, FL 34747                       )
                                            )
MILIMIR D ARSOV, M.D.                       )
908 W. Magnolia St.                         )
Kissimmee, FL 34741                         )
                                            )

CARDIAC CLINIC OF SUNIL M.     )
KAKKAR, M.D., PA     )
311 West Oak St.     )
Kissimmee, FL 34741     )
     )
SUNIL M. KAKKAR, M.D.     )
311 West Oak St.     )
Kissimmee, FL 34741     )
     )
MANOJ K. AGRAWAL, M.D.     )
311 West Oak St.     )
Kissimmee, FL 34741     )
     )
SAQIB A. GOWANI, M.D.     )
311 West Oak St.     )
Kissimmee, FL 34741     )
     )
SUNIL KUMAR, M.D.     )
311 West Oak St.     )
Kissimmee, FL 34741     )
     )
ATUL MADAN, M.D.     )
311 West Oak St.     )
Kissimmee, FL 34741     )
     )
PADMA K. RAJU, M.D.     )
311 West Oak St.     )
Kissimmee, FL 34741     )
     )
KHURRAM MOIN, M.D.     )
311 West Oak St.     )
Kissimmee, FL 34741     )
     )
CARDIOVASCULAR ASSOCIATES, INC.     )
601 Oak Commons Blvd.     )
Kissimmee, FL 34741     )
     )
JOHNSON P. MASSEY, M.D.     )
601 Oak Commons Blvd.     )
Kissimmee, FL 34741     )
     )
PATRICK F. MATHIAS, M.D.     )
601 Oak Commons Blvd.     )

Kissimmee, FL 34741                                   )
                                                      )
ROBERT L. BARRETT, M.D.                               )
601 Oak Commons Blvd.                                 )
Kissimmee, FL 34741                                   )
                                                      )
JOOBY JOHN, M.D.                                      )
601 Oak Commons Blvd.                                 )
Kissimmee, FL 34741                                   )
                                                      )
THOMAS Y. KIM, M.D.                                   )
601 Oak Commons Blvd.                                 )
Kissimmee, FL 34741                                   )
                                                      )
MUKESH KUMAR, M.D.                                    )
601 Oak Commons Blvd.                                 )
Kissimmee, FL 34741                                   )
                                                      )
NAUSHAD A. SHAIK, M.D.                                )
601 Oak Commons Blvd.                                 )
Kissimmee, FL 34741                                   )
                                                      )
JAMES K. WARREN, M.D.                                 )
601 Oak Commons Blvd.                                 )
Kissimmee, FL 34741                                   )
                                                      )
CARDIOVASCULAR CONSULTANTS                            )
GROUP, LLC        (KISSIMMEE)                          )
8900 Elliotts Court                                   )
Orlando, FL 32836                                     )
3223 Hillsdale Ln.                                    )
Kissimmee, FL 34741                                   )
                                                      )
IMRAN BAWANEY, M.D.,                                  )
3223 Hillsdale Ln.                                    )
Kissimmee, FL 34741                                   )
                                                      )
FLORIDA CARDIOLOGY, PA                                )
(ORLANDO)                                             )
483 N. Semoran Blvd., Ste. 102                        )
Winter Park, FL 32792                                 )
14501 Gatorland Dr.                                   )
Orlando, FL 32837                                     )

5

SAYED T. HUSSAIN, M.D.          )
14501 Gatorland Dr.          )
Orlando, FL 32837          )
          )
ROBERTO L. TORRES-AGUIAR, M.D.  )
14501 Gatorland Dr.          )
Orlando, FL 32837          )
          )
USMAN R. SIDDIQUE, M.D.      )
14501 Gatorland Dr.          )
Orlando, FL 32837          )
          )
GIANCARLO SPEZIANI, M.D.     )
14501 Gatorland Dr.          )
Orlando, FL 32837          )
          )
GOWANI MEDICAL ASSOCIATES, M.D., )
PLLC,          )
7224 Stonerock Cir          )
Orlando, FL 32819          )
          )
SHERALI H. GOWANI, M.D.      )
7224 Stonerock Cir          )
Orlando, FL 32819          )
          )
HEART OF FLORIDA CARDIOLOGY, PA  )
1032 Mann St.          )
Kissimmee, FL 34741          )
          )
LE ROI K. PRICE, M.D.        )
1016 Mann St.          )
Kissimmee, FL 34741          )
          )
INSTITUTE FOR ADVANCED      )
CARDIOVASCULAR CARE, LLC    )
(KISSIMMEE)          )
3225 Hillsdale Ln.          )
Kissimmee, FL 34741          )
          )
AAMIR JAVAID, M.D.        )
3225 Hillsdale Ln.          )
Kissimmee, FL 34741          )

INTERNAL MEDICINE & CARDIOLOGY      )
ASSOCIATES, PA                                        )
1819 West Oak St.                                      )
Kissimmee, FL 34741                                 )
                                                                  )
NASIR I. RAHMATULLAH, M.D.              )
1819 West Oak St.                                      )
Kissimmee, FL 34741                                 )
                                                                  )
M. KALAKOTA, M.D., PA                         )
1920 North Central Ave.                             )
Kissimmee, FL 34741                                 )
                                                                  )
MADHUSUDANA KALAKOTA, M.D.,       )
1920 North Central Ave.                             )
Kissimmee, FL 34741                                 )
                                                                  )
PriMED HEALTHCARE, PA                       )
302 West Bass St.                                       )
Kissimmee, FL 34741                                 )
                                                                  )
RAFAEL JIMENEZ, M.D.                          )
302 West Bass St.                                       )
Kissimmee, FL 34741                                 )
                                                                  )
SOLEIL SURGICAL LLC                          )
1205 North Central Ave.                             )
Kissimmee, FL 34741,                               )
                                                                  )
JULIO CALDERIN, M.D.                          )
1205 North Central Ave.                             )
Kissimmee, FL 34741,                               )
                                                                  )
             Defendants.                                  )

## FIRST AMENDED *QUI TAM* COMPLAINT

Plaintiffs United States of America ("USA") and the State of Florida, *ex rel.* Stephen

Stoops, M.D. ("Relator"), bring this First Amended *Qui Tam* Complaint against defendant

HCA, INC ("HCA"), defendant Osceola Regional Hospital, Inc. d/b/a/ Osceola Regional

7

Medical Center ("ORMC") and defendant North Florida Division I, Inc. (collectively referred to herein as the "Hospital Defendants" or "ORMC"); and neurology practice and physician defendants Orange County Neurology Clinic, LLC (d/b/a Brain and Nerve Center, Orlando), Yassar Chakfe, M.D., Lake City Institute of Neurology, PA (d/b/a Florida Institute of Neurology – St. Cloud),  Naga Lakshmana P. Nidadavolu, M.D., Neurology Consultants Central Florida, Inc., Abdul Mamsa, M.D., Neurological Health Associates, LLC, Fernando Gonzales-Portillo, M.D., S.A. Neurology, LLC, and Saif Ullah, M.D. (collectively referred to herein as the "Neurology Defendants"); and cardiology practice and physician defendants Advanced Cardiology Specialists, PA, Salah Din, M.D., Milimir D. Arsov, M.D., Cardiac Clinic of Sunil M. Kakkar, M.D., Sunil M. Kakkar, M.D., Manoj K. Agrawal, M.D., Saqib A. Gowani, M.D., Sunil Kumar, M.D., Atul Madan, M.D., Padma K. Raju, M.D., Khurram Moin, M.D., Cardiovascular Associates, Inc., Johnson P. Massey, M.D., Patrick F. Mathias, M.D., Robert L. Barrett, M.D., Jooby John, M.D., Thomas Y. Kim, M.D., Mukesh Kumar, M.D., Naushad A. Shaik, M.D., James K. Warren, M.D., Cardiovascular Consultants Group, LLC (Kissimmee), Imran Bawaney, M.D., Florida Cardiology, PA (Orlando), Sayed T. Hussain, M.D., Roberto L. Torres-Aguiar, M.D., Usman R. Siddique, M.D., Giancarlo Speziani, M.D., Gowani Medical Associates, M.D., PLLC, Sherali H. Gowani, M.D., Health of Florida Cardiology, PA, Le Roi K. Price, M.D., Institute for Advanced Cardiovascular Care, LLC (Kissimmee), Aamir Javaid, M.D., Internal Medicine & Cardiology Associates, PA, Nasir I. Rahmatullah, M.D., M. Kalakota, M.D., PA, Madhusudana Kalakota, M.D., PriMed Healthcare, PA, Rafael Jimenez, M.D. (collectively referred to as the "Cardiology Defendants"); Soleil Surgical, LLC and Julio

Calderin, M.D. (referred to herein as "Vascular Surgeon Defendants"), for liability for treble damages and civil penalties arising from a kickback and fraudulent billing scheme involving nurse practitioners provided to the Neurology, Cardiology and Vascular Surgeon Defendants by the Hospital Defendants. These schemes caused false claims to be made to Medicare, Medicaid and other government healthcare plans in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "False Claims Act") and the Florida False Claims Act, F.S.A. 68.081, *et seq.* Relator further alleges and states as follows:

## JURISDICTION, VENUE AND STATUTORY REQUIREMENTS

1.     This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq.* Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b) and 28 U.S.C. § 1331 and the Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

2.     Jurisdiction over Defendants and venue are proper because the acts proscribed by 31 U.S.C. §§ 3729, *et seq.* complained of herein took place in part in this district and Defendants transacted and continue to transact business in this district.

3.     Pursuant to 31 U.S.C. § 3730(b)(2), the Relator will serve with the First Amended Complaint to the Attorney General of the United States, the Attorney General of Florida and the United States Attorney for the Middle District of Florida (courtesy copy) a statement of all material evidence and information currently in his possession and of which he is the original source.  This disclosure statement is supported by material evidence known to Relator at the time of filing establishing the existence of Defendants' false claims. Because the statement includes attorney-client communications and work product of

Relator's attorney, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, Relator understands this disclosure to be confidential.

## PARTIES

4.      Relator Stephen Stoops, M.D., is an individual residing in Kansas. From April 2015 until February 2019, Relator worked as the Chief Medical Officer for Osceola Regional Medical Center ("ORMC"). Relator brings this action on behalf of himself and on behalf of Plaintiffs the United States of America and the State of Florida.

5.      Defendant HCA, Inc. is a for-profit corporation headquartered in Nashville, Tennessee, and organized and existing under the laws of the State of Delaware. Defendant HCA, Inc.'s principal place of business is 1 Park Plaza, Nashville, TN 37203 and its mailing address is HCA Legal Department, P.O. Box 750, Nashville, TN 37202-0750. Defendant HCA, Inc. wholly owns Defendant Osceola Regional Hospital, Inc.

6.      Defendant Osceola Regional Hospital, Inc. is a for-profit corporation organized and existing under the laws of the State of Florida with a principal place of business at One Park Plaza, Nashville, TN 37203 and a mailing address of P.O. Box 750, Nashville, TN 37202. It operates under the fictitious name "Osceola Regional Medical Center" (or "ORMC") in Osceola, Florida at 700 West Oak Street, Kissimmee, FL 34741 and is part of HCA's North Florida Division along with 13 other HCA hospitals. Defendant Osceola Regional Hospital, Inc. shares the same corporate executives as Defendant HCA, Inc. and is wholly owned by HCA, Inc.

7.      Defendant North Florida Division I, Inc. is a for-profit corporation organized

and existing under the laws of the State of Florida Corporation with a principal place of business at One Park Plaza, Nashville, TN 37203 and a mailing address of P.O. Box 750, Nashville, TN 37202.

8.      Defendant North Florida Division I, Inc. shares the same corporate executives as Defendant HCA, Inc. and is wholly owned by HCA, Inc.

9.      Defendants HCA, Inc., Osceola Regional Hospital, Inc. and North Florida Division I, Inc. are collectively referred to herein as the "Hospital Defendants" or "ORMC."

10.      ORMC is a 404 bed, for-profit, tertiary care medical center located at 700 West Oak Street, Kissimmee, FL 34741. From 2013 to present, under the direction and control of the Hospital Defendants, ORMC experienced significant volume and financial growth. ORMC became the second highest revenue facility in the HCA North Florida Division with EBITDA earnings escalating threefold from approximately $50 million to approximately $130 million during this time.

11.      The Hospital Defendants have and, upon information and belief, continue to engage in the fraudulent schemes outlined herein with the Neurology Defendants, Cardiology Defendants and Vascular Surgeon Defendants.

12.      Defendant Orange County Neurology Clinic, LLC is a for-profit limited liability corporation organized and existing under the laws of the State of Florida with a principal place of business and mailing address at 4359 Hunters Park Ln., Orlando, FL 32837. It does business as Brain and Nerve Center, Orlando.

13.      Defendant Yassar Chakfe, M.D. is an individual medical doctor who

practices neurology at the Brain and Nerve Center, Orlando, 4359 Hunters Park Ln., Orlando, FL 32837. Dr. Chakfe is listed as the Registered Agent and Manager of Defendant Orange County Neurology Clinic, LLC.

14.     Defendant Lake City Institute of Neurology, PA is a professional association organized and existing under the laws of the State of Florida with a principal place of business at 4741 Old Canoe Creek Road, Ste. 2, St. Cloud, FL 34769 and a mailing address at 4006 Isabella Circle, Orlando, FL 34786. It does business as Florida Institute of Neurology.

15.     Defendant Naga Lakshmana P. Nidadavolu, M.D., is an individual medical doctor who practices neurology at the Florida Institute of Neurology at 4741 Old Canoe Creek Road, Ste. 2, St. Cloud, FL 34769. He is the President of Defendant Lake City Institute of Neurology, PA.

16.     Defendant Neurology Consultants of Central Florida, Inc. is a corporation organized and existing under the laws of the State of Florida with a principal place of business and mailing address at 820 West Oak Street, Kissimmee, FL 34741.

17.     Defendant Abdul Mamsa, M.D., is an individual medical doctor practicing neurology at and also serves as a Director of Defendant Neurology Consultants of Central Florida, Inc. at 820 West Oak Street, Kissimmee, FL 34741.

18.     Defendant Neurological Health Associates, LLC is a limited liability corporation organized and existing under the laws of the State of Florida with a principal place of business at 1114 Cypress Glen Circle, Kissimmee, FL 34741 and a mailing address of 6735 Conroy Road, Ste. 229, Orlando, FL 32835.

19.     Defendant Fernando Gonzales-Portillo, M.D., is an individual medical doctor practicing neurology at Defendant Neurological Health Associates, LLC, 1114 Cypress Glen Circle, Kissimmee, FL 34741. Dr. Gonzales-Portillo also serves as Registered Agent and Manager of Defendant Neurological Health Associates, LLC.

20.     Defendant S.A. Neurology, LLC is a limited liability corporation organized and existing under the laws of the State of Florida with a principal place of business at 7376 Stonerock Circle, Orlando, FL 32819 and a mailing address of 11336 Bridge House Road, Windermere, FL 34786.

21.     Defendant Saif Ullah, M.D., is a medical doctor practicing neurology at Defendant S.A. Neurology, LLC, 7376 Stonerock Circle, Orlando, FL 32819. He also serves as Registered Agent and Manager of Defendant S.A. Neurology, PA.

22.     Defendant Advanced Cardiology Specialists, PA, is a professional association organized and existing under the laws of the State of Florida with a principal place of business and mailing address at 7300 Sandlake Commons Blvd., Ste. 321, Orlando, FL 32819.

23.     Defendant Salah Din, M.D., is an individual medical doctor who practices cardiology at Defendant Advanced Cardiology Specialists, PA, 7300 Sandlake Commons Blvd., Ste. 321, Orlando, FL 32819. Dr. Din also serves as the Registered Agent of Defendant Advanced Cariology Specialists, PA.

24.     Defendant Milimir D Arsov, M.D., is an individual medical doctor who practices cardiology at 908 West Magnolia Street, Kissimmee, FL 34741.

25.     Defendant Cardiac Clinic of Sunil M. Kakkar, M.D., PA is a professional

association organized and existing under the laws of the State of Florida with a principal place of business and mailing address at 311 West Oak Street, Kissimmee, FL 34741.

26.     Defendants Sunil M. Kakkar, M.D., Manoj K. Agrawal, M.D., Saqib A. Gowani, M.D., Sunil Kumar, M.D., Atul Madan, M.D., Padma K. Raju, M.D., and Khurram Moin, M.D. are individual medical doctors practicing cardiology at Defendant Cardiac Clinic of Sunil M. Kakkar, M.D., PA, 311 West Oak Street, Kissimmee, FL 34741. Dr. Kakkar also serves as the President of Defendant Cardiac Clinic of Sunil M. Kakkar, M.D., PA. Dr. Kumar serves as Director, Drs. Madan and Raju serve as DVP, and Drs. Agrawal and Moin serve as D of Defendant Cardiac Clinic of Sunil M. Kakkar, M.D.

27.     Defendant Cardiovascular Associates, Inc. is a corporation organized and existing under the laws of the State of Florida with a principal place of business and mailing address at 601 Oak Commons Blvd., Kissimmee, FL 34741.

28.     Defendants Johnson P. Massey, M.D., Patrick F. Mathias, M.D., Robert L. Barrett, M.D., Jooby John, M.D., Thomas Y. Kim, M.D., Mukesh Kumar, M.D., Naushad A. Shaik, M.D. and James K. Warren, M.D. are individual medical doctors practicing cardiology at Defendant Cardiovascular Associates, Inc., 601 Oak Commons Blvd., Kissimmee, FL 34741. Dr. Massey is the Registered Agent and, as for Officer/Director positions of Defendant Cardiovascular Associates, Inc., Dr. Massey is VD, Dr. Mathias is STD, Dr. Barrett is VD, Dr. John is VD, Dr. Kim is PD, Dr. Kumar is VD, and Dr. Shaik is VD.

29.     Defendant Cardiovascular Consultants Group, LLC (Kissimmee) is a limited liability corporation organized and existing under the laws of the State of Florida with a

principal place of business and mailing address at 8900 Elliotts Court, Orlando, FL 32836 and another place of business at 3223 Hillsdale Ln., Kissimmee, FL 34741.

30.    Defendant Imran Bawaney, M.D. is an individual medical doctor practicing cardiology at Defendant Cardiovascular Consultants Group, LLC (Kissimmee), 3223 Hillsdale Ln., Kissimmee, FL 34741. Dr. Bawaney also serves as the Manager and Registered Agent for Defendant Cardiovascular Consultants Group, LLC.

31.    Defendant Florida Cardiology, PA is a professional association organized and existing under the laws of the State of Florida with a principal place of business and mailing address at 483 N. Semoran Blvd., Ste. 102, Winter Park, FL 32792 and a place of business at 14501 Gatorland Drive, Orlando, FL 32837.

32.    Defendants Sayed T. Hussain, M.D., Roberto L. Torres-Aguiar, M.D., Usman R. Siddique, M.D., and Giancarlo Speziani, M.D., are individual medical doctors who practice cardiology with Defendant Florida Cardiology, PA at 14501 Gatorland Drive, Orlando, FL 32837.

33.    Defendant Gowani Medical Associates, M.D., PLLC, is a professional limited liability corporation organized and existing under the laws of the State of Florida with a principal place of business and mailing address at 7224 Stonerock Circle, Orlando, FL 32819. Yasmeen Gowani, M.D., is the registered agent.

34.    Defendant Sherali H. Gowani, M.D., is an individual medical doctor practicing cardiology at Defendant Gowani Medical Associates, M.D., PLLC, 7224 Stonerock Circle, Orlando, FL 32819. Dr. Gowani also serves as Manager of Defendant Gowani Medical Associates, M.D., PLLC.

35.     Defendant Heart of Florida Cardiology, PA is a professional association organized and existing under the laws of the State of Florida with a principal place of business and mailing address at 1032 Mann St., Kissimmee, FL 34741.

36.     Defendant Le Roi K. Price, M.D., is an individual medical doctor who practices cardiology at Defendant Heart of Florida Cardiology, PA, 1032 Mann St., Kissimmee, FL 34741.

37.     Defendant Institute for Advanced Cardiovascular Care, LLC (Kissimmee) is a limited liability corporation organized and existing under the laws of the State of Florida with a principal place of business at 3225 Hillsdale Lane, Kissimmee, FL 34741 and a mailing address at 11012 Bridge House Road, Windermere, FL 34786.

38.     Defendant Aamir Javaid, M.D., is an individual medical doctor practicing cardiology at Defendant Institute for Advanced Cardiovascular Case, LLC at 3225 Hillsdale Lane, Kissimmee, FL 34741. Dr. Javaid also serves as MGRM and Registered Agent for Defendant Institute for Advanced Cardiovascular Case, LLC.

39.     Defendant Internal Medicine & Cardiology Associates, PA, is a professional association organized and existing under the laws of the State of Florida with a principal place of business and mailing address at 1819 W. Oak Street, Kissimmee, FL 34741.

40.     Defendant Nasir I. Rahmatullah, M.D., is an individual medical doctor practicing cardiology at Defendant Internal Medicine & Cardiology Associates, PA, 1819 W. Oak Street, Kissimmee, FL 34741. Dr. Rahmatullah also serves as President and Registered Agent of Internal Medicine & Cardiology Associates, PA.

41.     Defendant M. Kalakota, M.D., PA is a professional association organized

and existing under the laws of the State of Florida with a principal place of business and mailing address at 1920 North Central Ave., Kissimmee, FL 34741.

42.     Defendant Madhusudana Kalakota, M.D., is an individual medical doctor who practices cardiology at Defendant M. Kalakota, M.D., PA, 1920 North Central Ave., Kissimmee, FL 34741. Dr. Kalakota also serves as President of Defendant M. Kalakota, M.D., PA.

43.     Defendant Pri-Med Health Care, PA is a professional association organized and existing under the laws of the State of Florida with principal place of business and mailing address at 302 W. Bass Street, Kissimmee, FL 34741.

44.     Defendant Rafael Jimenez, M.D., is an individual medical doctor practicing cardiology at Defendant Pri-Med Health Care, PA. Dr. Jimenez also serves as the PSTD and Registered Agent of Defendant Pri-Med Health Care, PA.

45.     Defendant Soleil Surgical LLC is a limited liability corporation organized and existing under the laws of the State of Florida with principal place of business and mailing address at 1205 N. Central Ave., Kissimmee, FL 34741.

46.     Defendant Julio Calderin, M.D., is an individual medical doctor who practices vascular surgery at Defendant Soleil Surgical LLC, 1205 N. Central Ave., Kissimmee, FL 34741. Dr. Calderin also serves as the Manager, President and Treasurer of Defendant Soleil Surgical LLC, 1205 N. Central Ave., Kissimmee, FL 34741.

## THE APPLICABLE STATUTES AND AUTHORITIES

### Statutes and Authorities Relating to Kickbacks

47.     The AKS, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that

remuneration given to those who can influence health care decisions would result in the provision of goods and services that are medically unnecessary, of poor quality or even harmful to a vulnerable patient population. To protect patient and government healthcare plans like Medicare and Medicaid (referred to herein as "Government Healthcare Plans") from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Publ. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Publ. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

48.    The AKS makes it illegal for individuals or entities to "offer[] or pay[] any remuneration (including any kickback, bribe, or rebate)" to induce business reimbursed under the Government Healthcare Plans. *See* 42 U.S.C. § 1320a-7b(b)(2). The types of remuneration covered by the AKS include remuneration intended to induce the referrals of patients and remuneration intended to induce the ordering for any facility paid for by Medicare or State health care programs.

49.    According to 42 CFR Part 1001, "This [AKS] provision is extremely broad. The types of remuneration covered specifically include kickbacks, bribes, and rebates made directly or indirectly, overtly or covertly, or in cash or in kind."

50.    Violation of the AKS is a felony punishable by fines and imprisonment, and can also result in exclusion from participation in Government Healthcare Plans. 42 U.S.C. § 1320a-7b(b)(2) and 42 U.S.C. § 1320a-7(b)(7).

51.     Here, and as outlined in detail below in paragraphs 73 to 78 and 108, the remuneration was the provision of nurse practitioners ("NPs") by the Hospital Defendants to the Neurology Defendants, Cardiology Defendants and Vascular Surgeon Defendants (collectively referred to herein as "Physician Defendants") free of charge so that the HCA/ORMC NPs could perform services on patients for which the Physician Defendants billed and collected payment from Government Healthcare Plans as if the Physician Defendants had performed the patient services themselves. This kickback scheme also allowed the Physician Defendants to bill for a full day of patients at their private practices and/or other hospital facilities while they were supposed to be on-call seeing the Hospital Defendants' patients. In exchange, the Physician Defendants referred patients to and conferred other marketing and monetary benefits on the Hospital Defendants (like the ability to attract and bill for high Diagnosis Related Group ("DRG") level patients).

52.     The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986). As relevant here, the FCA establishes treble damages liability to the United States for an individual or entity that:

> (i)     "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1) (2000) and, as amended, 31 U.S.C. § 3729(a)(1)(a);

> (ii) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, *id.* § 3729(a)(1)(B); or

> (iii) "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid" *id.* § 3729(a)(3)(1986), and, as amended, 31 U.S.C. § 33729(a)(1)(C).

53.     "Knowing," within the meaning of the FCA, is defined to include reckless disregard and deliberate indifference. *Id.*

54.     "Knowing," within the meaning of the Florida False Claims Act, is defined to include deliberate ignorance of the truth or falsity of the information and acts in reckless disregard of the truth or falsity of the information. *See* FL STAT §68.082(1).

55.     No proof of specific intent to defraud is required under either the False Claims Act or the Florida False Claims Act.

56.     Although the Hospital and Physician Defendants knew they were bound by the AKS, they have chosen and continue to choose to disregard these laws and prohibitions, instead choosing to put EBIDA growth, profits and convenience before their duty to comply with federal law. Moreover, falsely certifying compliance with these laws in connection with a claim submitted to a federally funded insurance program is actionable under the FCA. As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, 6402(f), 124 Stat. 119, codified at 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."

57.     As noted above below in paragraphs 70, 73 and 109 to 110, in return for the NPs provided by the Hospital Defendants, the Physician Defendants would refer patients to the Hospital Defendants' ORMC.

**The Stark Law**

58.     Federal law restricts the financial relationships that hospitals and clinics may have with doctors who refer patients to them. Accordingly, referring patients to HCA's

ORMC in exchange for HCA providing NPs to the Physician Defendants not only violates the federal AKS, but also the Stark Law. The Stark Law prohibits healthcare providers from referring business to entities where they or an immediate family member have a *direct or indirect financial interest. See* 42 U.S.C. § 1395nn; 42 C.F.R. § 411.350, *et seq.* The Physician Defendants had a direct or indirect financial interest in HCA because HCA was providing them with a significant and expensive benefit – NPs to do their work – work for which they were able to bill and collect physician rates. The Physician Defendants thus had an interest in the financial well-being of ORMC so that ORMC could continue providing them with the NPs to facilitate the physician billing fraud, and the physicians referred patients to ORMC to enhance the financial health of ORMC.  In addition, the NP scheme was a way to provide compensation to the Physician Defendants and to secure patient referrals and the physicians' affiliation with ORMC, which allowed accreditations and marketing perks for the Hospital Defendants like Level 2 Trauma, comprehensive stroke center and structural heart program, as set forth in more detail below in paragraphs 73-78, 79-103, 104-111 and 114-120.

**The CMS Regulations Concerning Billing for Services Provided by Nurse Practitioners**

59.    "In general, NPs and CNSs are paid for covered services at 80 percent of the lesser of the actual charge or 85 percent of what a physician is paid under the Medicare Physician Fee Schedule." *See* Medicare Claims Processing Manual, Chapter 12, "Physician and Nonphysician Practitioners," §120 "Nurse Practitioner (NP) and Clinical Nurse

Specialist (CNS)." "NPs and CNSs must have their own "nonphysician practitioner" national provider identification (NPI) number for billing purposes." §120.3.A.

60.     When the Physician Defendants billed Medicare, Medicaid and other government healthcare plans as if they had provided the services to ORMC patients, they billed at a physician rate that was 15-20% higher than the NP rate, and, moreover, they billed for services they never provided.

61.     Although a physician can bill for "incident to" billing if an NP provides the services under the physician's supervision, none of the "incident to" billing requirements are met here. The NPs were not hired by the Physician Defendants. They were ORMC NPs that were provided to the Physician Defendants as a kickback.

## THE GOVERNMENT HEALTHCARE PROGRAMS

62.     Medicare is a federal program that provides federally subsidized health insurance for persons who are 65 or older or are disabled. *See* 42 U.S.C. §§ 1395, *et seq.* ("Medicare Program"). Part B of the Medicare Program provides supplemental benefits to participants to cover, among other things, physician services, procedures, prescription drugs and devices. *See generally id.* §§ 1395j-1395w-4. Part D of the Medicare Program was enacted as part of the Medicare Prescription Drug Improvement and Modernization Act of 2003, Pub. L. No. 108-173, to provide prescription drug benefits for Medicare beneficiaries. All persons enrolled in Medicare Part A and/or Medicare Part B are eligible to enroll in a prescription drug plan under Part D. The Department of Health and Human Services ("HHS"), through its component agency, CMS, enters into agreements with private contractors authorized to sell Part D insurance coverage.

63.     Medicare enters into provider agreements with providers and suppliers to establish their eligibility to participate in the program. During the relevant times, to be eligible for payment under the Medicare program, providers and suppliers must certify:

> I agree to abide by the Social Security Act and all applicable Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations and program instructions are available through the Medicare contractor I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

*See, e.g.,* CMS Form-855S (04/06) at 26.

64.     The federal Medicaid Program was created in 1965 under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* Funding for Medicaid is shared between the federal government and those states participating in the Medicaid program. Federal funds are distributed to the states, which in turn provide certain medical services to certain low-income individuals.

65.     Federal Medicaid regulations require each state to designate a single state agency responsible for administering the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of Health and Human Services ("the Secretary"). After the Secretary approves the plan submitted by the state, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan. *See* 42 U.S.C. § 1396b(a)(1). This reimbursement is called "federal financial participation" ("FFP").

66.    The Florida Medicaid program is a program that provides medical coverage to low-income individuals and families. The State of Florida and the federal government share the cost of funding the Florida Medicaid program.

67.    The federal TRICARE program provides health benefits to eligible dependents of active duty, retired members of the uniformed services and their eligible dependents, eligible spouses and dependents of deceased members, as well as to TRICARE eligible beneficiaries, in certain circumstances, who are also Medicare eligible. TRICARE is administered by the TRICARE Management Activity ("TMA"). TMA is Department of Defense ("DOD") Field Activity of the Under Secretary of Defense for Personnel and Readiness ("USD (P&R)") to operate under the authority, direction and control of the Assistant Secretary of Defense for Health Affairs ("ASD (HA)"). DOD is an agency and instrumentality of the United States, and its TMA/TRICARE activities, operations, and contracts are paid with federal funds. *See* 10 U.S.C. §§ 1071, *et seq.*

68.    These federal and state programs are referred to collectively herein as the "Government Healthcare Plans."

## STATEMENT OF FACTS

### Background

69.    ORMC is a 404 bed, for-profit, tertiary care medical center located in Kissimmee, Osceola County, Florida. ORMC is one of 14 affiliated hospitals in the North Florida Division of HCA Defendant. ORMC has experienced significant volume and financial growth from 2013 to present. With ORMC's increased growth came increased competition in the community, especially from Advent Health Florida Hospital ("Florida

Hospital") and most recently, Orlando Regional Medical Center ("Orlando Regional").

70.     In his position as CMO from 2015 to 2019, Relator learned that ORMC had devised a kickback scheme involving NPs to compete with Florida Hospital and Orlando Regional (the other hospitals in the region) to entice physicians to refer patients to ORMC from the three key service lines – cardiology, neurology and vascular surgery. As set forth more fully below in paragraphs 104 to 111 and 114-121, these service lines were critical to enable the Hospital Defendants to establish a Level 2 trauma center, a comprehensive stroke center and structural heart program, which allowed the Hospital Defendants to attract more patients and to attract patients with higher DRG billing reimbursement. Upon information and belief, this NP scheme continues today.

71.     These three service lines were crucial to ORMC's rapid and continued growth and competitive advantage over Florida Hospital and Orlando Regional and, thus, ORMC devised an illegal kickback scheme to retain and grow the business. As set forth below in paragraphs 73-78, 79-103, 104-111 and 114-120, both the Hospital Defendants and the Physician Defendants reaped myriad benefits from the NP kickback scheme.

72.     The fraudulent NP scheme was successful and ORMC saw its pre-EBIDTA earnings almost *triple* from approximately $50 million in 2014 to approximately $130 million in 2018, and it grew to be the second highest level revenue facility in the entire HCA North Florida Division.

**Defendants' Fraudulent Nurse Practitioner Scheme**

73.     After Relator came to work at ORMC in April 2015 as Chief Medical Officer, he learned that ORMC was hiring NPs to perform work for Cardiology Defendants' physicians. While this practice started as a way to minimize ORMC paying physician compensation for "on-call coverage," Relator learned that it had become a large and widespread kickback scam used to provide remuneration to the Cardiology, Neurology and Vascular Surgeon Defendants in exchange for the referral of patients and other benefits to ORMC.

74.     Call coverage ostensibly required the Cardiology, Neurology and Vascular Surgeon Defendants to be on-call for in-patient consults and to provide continued care for any patients ORMC admitted through its Emergency Room ("ER"). Any patients who came to ORMC who were unassigned to physicians (referred to herein as "Unassigned Patients") were admitted to the hospital through the ER by a hospitalist and then were provided cardiology, neurology and vascular surgery consultations, as needed. These Unassigned Patients were expected to receive on-call services from the physicians who work for the Physician Defendants.

75.     The Unassigned Patients were not seen by physicians from the Physician Defendants, but rather, were seen for initial consultations and follow-up visits by NPs hired by and provided by the Hospital Defendants as part of the kickback scheme.

76.     The fraud was such that Relator received complaints from patients at ORMC that they were *never* seen by a physician during their hospital stay. After receiving such complaints, Relator reviewed patient charts and confirmed it was true – that ORMC's NPs,

26

and not the physicians, were providing the patient initial consultations, daily follow-up and progress notes. These patient complaints are in the ORMC complaint log that is required by CMS for any patient complaint (other than financial complaints) that cannot be resolved prior to discharge or is received after discharge.

77.     Despite the fact that the NPs were providing the services on the ORMC patients, the Cardiology, Neurology and Vascular Surgeon Defendants billed Government Healthcare Plans under their own registered provider numbers, and Government Healthcare Plans paid them as if physicians had performed services on these Unassigned Patients when in fact they had not.

78.     With the increasing competition from Florida Hospital and Osceola Regional, it was getting increasingly harder to recruit physicians in these three service lines, so the Hospital Defendants provided the NPs as an irresistible benefit resulting in more revenue to the Physician Defendants to keep the Physician Defendants loyal to HCA and ORMC.

79.     The scheme worked as follows for the following Physician Defendants:

**Neurology Defendants**

80.     The individual neurologist physician defendants (collectively referred to herein as the "Neurologist Physicians") are all solo practitioners and their practices are as follows:

        a.      Orange County Neurology Clinic, LLC (d/b/a Brain and Nerve Center, Orlando), is owned and operated, upon information and belief, by solo practitioner Yassar Chakfe, M.D.

27

    b.     Lake City Institute of Neurology, PA (d/b/a Florida Institute of Neurology – St. Cloud) is owned and operated, upon information and belief, by solo practitioner Naga Lakshmana P. Nidadavolu, M.D.

    c.     Neurology Consultants Central Florida, Inc. is owned and operated, upon information and belief, by solo practitioner Abdul Mamsa, M.D.

    d.     Neurological Health Associates, LLC is owned and operated, upon information and belief, by solo practitioner Fernando Gonzales-Portillo, M.D.

    e.     S.A. Neurology, LLC is owned and operated, upon information and belief, by solo practitioner Saif Ullah, M.D.

    f.     Collectively, these neurology practices and individual solo practitioner physicians are referred to herein as the "Neurology Defendants" and the individual neurologist defendants are referred to as the "Neurologist Physicians."

81.    Starting in 2014 and continuing to 2018, each of these solo practitioner Neurologist Physicians were scheduled to be on-call for one week at a time.

82.    When the Neurologist Physicians would come in to ORMC for call coverage on Monday mornings during this time, they would be able to bill for initial consultations for approximately 15 newly admitted, Unassigned Patients who were new consults. This number would grow throughout the week because neurology patients generally stayed in the hospital for several days, and the Neurology Defendants would bill for daily follow up visits for those patients. In total, as the week progressed, the Neurologist Physicians were

*each* billing daily for approximately 45 ORMC patients (15 new consults daily and 30 follow up patients) in the beginning of the scheme in 2014 and 2015. Over time and in the later years of the scheme from 2016 to the present, the number of patients increased to 60-70 ORMC patients (15 new and the rest follow up).

83.     During the on-call week, the Neurologist Physicians in each of the Neurology Defendant medical clinics would also keep a full schedule of patients whom they saw (and billed for) at their respective clinics, as well as patients at other area hospitals.

84.     It was not humanly possible for the Neurologist Physicians to see all of the hospital and neurology clinic patients in one workday.

85.     During the time of the scheme, the Neurologist Physicians would bill up to *30 hours a day* collectively for patients at their respective clinics, other area hospitals and the Unassigned Patients at ORMC based on the services performed by the NPs provided by the Hospital Defendants.

86.     At most, the Neurologist Physicians would only spend a couple of hours a day in ORMC because the ORMC NPs were providing the patient services (initial consults and daily follow-up visits), for which the physicians were billing Government Healthcare Plans as if they had provided the services. Even if a Neurologist Physician had, hypothetically, spent all day at ORMC, that physician would not have been able to see and provide services for the 50-70 patients he was expected to service as part of his on-call contract, let alone any other patients outside of the ORMC at his private clinic or other area hospitals with which the Neurologist Physicians were affiliated.

87.     The neurology patients' primary care physicians would complain to Relator

about how the Neurologist Physicians would not see or would not timely see their patients, which was not only wrong from a billing perspective but also limiting patient care.

88.     In 2018, ORMC increased on-call pay from $500 a night to $1,500 a night but also told the Neurologist Physicians they had to be at ORMC for eight hours a day from 7 a.m. to 5 p.m. At the same time, ORMC increased the number of NPs it provided to the Neurologist Defendants to three or three and one-half NPs to provide services to all of the Neurology Defendants' ORMC patients, thus expanding the kickback scheme with additional remuneration.

89.     As noted above, eight hours a day was still not enough time for the Neurologist Physicians to see and provide care to the large caseload of 50-70 patients.

90.     The Neurologist Physicians could not have adequately managed the volume of the consult and follow-up service without the ORMC's NPs doing the work.  ORMC had knowledge that the NPs were performing these tasks and the Neurologist Physicians were billing for their services.  If the Neurologist Physicians were providing the services alone, there would not be enough time in any 24-hour period to provide the services and manage their practices and see patients at other hospitals with which they were also affiliated.

91.     The illegality of this scheme was highlighted in early third quarter of 2018. At that time, one neurologist group whom ORMC was trying to keep objected to the NP kickback arrangement and pointed out the illegalities of it. This law-abiding neurologist told ORMC that he could not use ORMC's NPs like the other practices were. He explained how he must see the patients himself or use his own NPs and bill "incident to." In response

to this neurologist's objections, ORMC put the illegal NP scheme in writing to try and further persuade him. After declining the kickback, this neurologist terminated the call coverage agreement and left because he could not keep up with the volume of patients at ORMC within the confines of legal billing.

**Cardiology Defendants**

92.     With respect to the individual cardiologist physician defendants (collectively referred to herein as the "Cardiologist Physicians"), their practices and ownership break down as follows:

a.     Advanced Cardiology Specialists, PA is owned and operated, upon information and belief, by solo practitioner Salah Din, M.D.

b.     Upon information and belief, Milimir D. Arsov, M.D. is a solo cardiology practitioner.

c.     Cardiac Clinic of Sunil M. Kakkar, M.D. is owned and/or operated, upon information and belief, by Sunil M. Kakkar, M.D., Manoj K. Agrawal, M.D., Saqib A. Gowani, M.D., Sunil Kumar, M.D., Atul Madan, M.D., Padma K. Raju, M.D. and Khurram Moin, M.D.

d.     Cardiovascular Associates, Inc. is owned and/or operated, upon information and belief, by Johnson P. Massey, M.D., Patrick F. Mathias, M.D., Robert L. Barrett, M.D., Jooby John, M.D., Thomas Y. Kim, M.D., Mukesh Kumar, M.D., Naushad A. Shaik, M.D. and James K. Warren, M.D.

e.     Cardiovascular Consultants Group, LLC (Kissimmee) is owned

and/or operated, upon information and belief, by solo practitioner Imran Bawaney, M.D.

f.      Florida Cardiology, PA (Orlando) is owned and operated, upon information and belief, by Sayed T. Hussain, M.D., Roberto L. Torres-Aguiar, M.D., Usman R. Siddique, M.D. and Giancarlo Speziani, M.D.

g.      Gowani Medical Associates, M.D., PLLC is owned and/or operated, upon information and belief, by solo practitioner Sherali H. Gowani, M.D.

h.      Health of Florida Cardiology, PA is owned and operated, upon information and belief, by solo practitioner Le Roi K. Price, M.D.

i.      Institute for Advanced Cardiovascular Care, LLC (Kissimmee) is owned and operated, upon information and belief, by solo practitioner Aamir Javaid, M.D.

j.      Internal Medicine & Cardiology Associates, PA is owned and operated by, upon information and belief, solo practitioner Nasir I. Rahmatullah, M.D.

k.      M. Kalakota, M.D., PA is owned and operated, upon information and belief, by solo practitioner Madhusudana Kalakota, M.D.

l.      PriMed Healthcare, PA is owned and operated, upon information and belief, by solo practitioner Rafael Jimenez, M.D.

m.      Collectively, these cardiology practices and individual cardiologist

physicians are referred to herein as the "Cardiology Defendants" and the individual cardiologist defendants are referred to as the "Cardiologist Physicians."

93.     From 2014 to present, the Cardiologist Physicians have been on-call at ORMC seeing 8-10 new consults a day; *plus* seeing patients in their clinics; *plus* doing cardiology procedures.

94.     Like the Neurologist Physicians, the Cardiologist Physicians saw a full day of clinic patients, in addition to seeing patients at other hospitals and/or performing cardiac procedures at ORMC, other facilities and their offices, while billing for a full day of hospital patients. These Cardiologist Physicians will have been billing for impossible 36-hour work-days due to the fact that the Hospital Defendants were providing them with NPs to perform initial consults and daily follow ups on the Unassigned Patients at ORMC.

95.     If the NPs got overwhelmed with seeing patients, the cardiologists would notice and would complain to the Hospital Defendants' VP of Cardiac Services and to Relator that the NPs were not seeing all of the patients as they were expected to.

96.     The Cardiologist Physicians were on-call for one 24-hour period. During this time, the Cardiologist Physicians would bill Government Healthcare Plans for 8 new consults (with the work being performed by ORMC NPs) while they were spending time in their offices seeing patients or doing procedures or cardiac catheterizations at the other area hospitals.

97.     As with the Neurologist Physicians, it was not humanly possible for the Cardiologist Physicians to see all of the ORMC patients, office patients and patients at the

33

other area hospitals in one 24-hour day. But the Cardiology Defendants billed for all of these patients because the ORMC NPs were doing the initial consults and daily follow-ups on their behalves.

98.    ORMC cardiology patients would complain to Relator that they had not been seen by a physician during their hospital stay. Relator reviewed patient records and confirmed that ORMC NPs, and not physicians, had provided the services to the patients.

**Vascular Surgeon Defendants**

99.    Vascular Surgeon Defendant Julio Calderin, M.D., is a solo practitioner who had an on-call contract with ORMC. He is the Manager, President and Treasurer of Defendant Soleil Surgical, LLC (collectively referred to as the "Vascular Surgeon Defendants"). In 2017, ORMC had not been able to recruit a permanent vascular surgeon so it provided the Vascular Surgeon Defendants with a NP as a kickback to keep Dr. Calderin's business in its facility rather than being recruited away. As he was the busiest surgeon in the hospital, ORMC could not afford to lose him.

100.    Because of the NP that ORMC provided, the Vascular Surgeon Defendants – one physician – provided 95% of the 24-hour/7-day a week vascular call coverage for the Level 2 trauma service at ORMC. At the same time he was supposedly providing call hospital coverage, Dr. Calderin performed operative procedures each day and would also see patients at his office across the street from ORMC. At the time Relator left ORMC in 2019, this was still the case.

101.    As with the other Physician Defendants, the NP provided by ORMC to the Vascular Surgeon Defendants performed initial consults and daily follow-ups to the

vascular surgeon patients, while the Vascular Surgeon Defendants billed the Government Healthcare Plans under Dr. Calderin's registered provider number as if he, the physician, was providing the services.

102.    As with the other Physician Defendants, it was not humanly possible for Dr. Calderin to see and provide services (including multiple operative procedures) to all of the ORMC patients as well as patients in his office across the street on his 24/7 call caseload.

103.    As with the other Physician Defendants, Dr. Calderin will have 30-36 billable hours in one day.

**Benefits to The Hospital and Physician Defendants From the NP Kickback Scheme**

104.    With respect to all of the Physician Defendants, ORMC was having trouble matching the call pay and incentives other hospitals could pay so they offered up the NPs to perform services that the Physician Defendants should have been providing, which freed the Physician Defendants up to bill for patients at their practices and other hospitals.

105.    The Physician Defendants were, in turn, billing Government Healthcare Plans as if they, the physicians, had done the initial consult evaluations, the daily follow-up visits and progress notes of the ORMC patients when they had not.

106.    The Government Healthcare Plans reimbursed the Physician Defendants at a higher, physician rate than they would have paid if billed for the NP rate.

107.    Had the Government Healthcare Plans known that the physicians did not perform the services for which they were billing, they would not have reimbursed the physicians for such services.

108.    There were several benefits from this NP remuneration paid by the Hospital

Defendants to the Cardiology, Neurology and Vascular Surgeon Defendants, including: (1) Providing extra compensation and a free service for the Physician Defendants who were able to collect payments from Government Funded Healthcare Plans for services they did not provide, which freed up their time to see and bill for patients at their clinics and other area hospitals (or just relax) (as documented in an email written by Sarabpreet Khara, VP of Neuroscience & Interventional Lab, outlined below); (2) Performing the consultation and daily follow-up visits/progress notes on behalf of the Physician Defendants (and allowing the Physician Defendants to subsequently bill Government Healthcare Plans for their professional services, even though the services were provided by HCA NPs); (3) Reducing the Physician Defendants' workload and encouraging the physicians to practice and provide services at ORMC in an ever-increasing competitive marketplace; and (4) Allowing Physician Defendants to build and see patients at their private practice offices as well as other area hospitals while, at the same time and on the same days, collecting their physician rates for the work provided by HCA NPs on patients in the hospital.

109.   In turn, there were several benefits to the Hospital Defendants from the kickback remuneration it paid to the Physician Defendants, including: (1) The large increase in case volume benefit to ORMC from having more patients from physician referrals; (2) With respect to neurology, the benefit of being able to market itself as a "comprehensive stroke center," and thereby attracting more patients and complex cases with high DRG payments and not having to transfer patients because ORMC could perform interventional stroke procedures; (3) With respect to neurology, the benefit of having higher activity stroke volume to feed patients to ORMC's newly opened Inpatient

Rehabilitation Center, which needed patients to start to turn a profit; (4) With respect to cardiology, the benefit of attracting more patients and complex cases with high DRG payments and not having to transfer patients because ORMC could perform STEMI (heart attack interventions) and provide complex structural heart procedures like TAVR, Watchman, and Mitraclip; (5) With respect to vascular surgery, the benefit of being able to retain its vascular surgeon, maintain its Level 2 trauma center status, attract more patients and complex cases with high DRG payments, and better compete with Florida Hospital and Orlando Medical Center by not having to transfer patients (without 24/7 vascular surgery coverage, ORMC's trauma program would be at substantial risk and patients would have to be transferred and ambulance services would bypass ORMC for hospitals being able to provide the more complex services, and thus lose highly reimbursed cases); and (6) with respect to all of the Physician Defendants, the benefit of not having to pay physician higher on-call pay, which is more expensive than hiring and paying NPs.

110.   Again, ORMC would not have seen the huge, rapidly escalating pre-EBIDTA earnings if it were not for these 3 service lines being developed by using the NPs as a kickback to the Physician Defendants.

111.   An estimated 75-80% of the patients affected by this kickback practice are on Government Healthcare Plans, namely managed Medicare and Medicaid plans.

**Specific CMS Billing Codes Defendants Used To Perpetrate the Fraud, Which Was Material to Reimbursement**

112.   The specific E/M Codes involved in the kickback scam from 2014 to present for the Neurology and Cardiology Defendants, and from 2017 to present for the Vascular

Surgeon Defendant, are as follows:

Initial inpatient visit codes:

    a.      99222 Initial Inpatient Care – Level 2 – 50 minutes

    b.      99223 Initial Inpatient Care – Level 3 – 75 minutes

Subsequent hospital visit codes:

    c.      99231 – 15 minutes

    d.      99232 Follow Up Inpatient Care – Level 2 – 25 minutes

    e.      99233 Follow Up Inpatient Care – Level 3 – 35 minutes

113.    "In general, NPs and CNSs are paid for covered services at 80 percent of the lesser of the actual charge or 85 percent of what a physician is paid under the Medicare Physician Fee Schedule." Medicare Claims Processing Manual, Chapter 12, "Physician and Nonphysician Practitioners," §120 "Nurse Practitioner (NP) and Clinical Nurse Specialist (CNS)." "NPs and CNSs must have their own "nonphysician practitioner" national provider identification (NPI) number for billing purposes." §120.3.A.

114.    The Government Healthcare Plans have been damaged by Defendants' fraud. First, the Government Healthcare Plans were unaware that NPs employed by the Hospital Defendants, and not the Physician Defendants or even NPs employed by the Physician Defendants, were performing the services for which the Physician Defendants sought and received reimbursement for 100% physician rates. Defendants' fraudulent conduct was material to the Government Healthcare Plans' decisions to allow reimbursement of at least approximately $8,864,479.05 (after managed care discounts were applied). Second, the Government Healthcare Plans were unaware that the Hospital Defendants were able to

receive and maintain accreditation for the ORMC Comprehensive Stroke Center and Level 2 Trauma Center (the "Centers") because the Neurologist and Vascular Surgeon Defendants had agreed to affiliate with ORMC as part of the NP kickback. As a result of the ill-gotten accreditations, the Hospital Defendants were able to retain, treat and bill for patients at the Centers. Had the Government Healthcare Plans known about Defendants' fraudulent conduct, the Plans would not have allowed reimbursement for the hospital component of the DRG codes for patients at those Centers, which were billed at high DRG codes because of the complexity of care required. Defendants' fraudulent conduct was material to the Government Healthcare Plans' decisions to allow reimbursement of hospital component DRG codes for ORMC's Comprehensive Stroke Center and Level 2 Trauma Center patients, all of whom were there by virtue of the kickback scheme that cemented affiliation of the Neurologist and Vascular Surgeon Defendants with ORMC and ORMC's accreditation as a Comprehensive Stroke Center and Level 2 Trauma Center.

**The HCA Defendants Benefitted From and Knew About The Fraud**

115.    The NP kickback fraud at ORMC was easily identifiable – and indeed even questioned by senior HCA leadership – because ORMC was an outlier in the amount of NPs it hired compared to other Defendant HCA hospitals. ORMC hired more NPs than the entire North Florida Division *combined* (13 other hospitals). ORMC was in the top 99% of HCA nationwide (180 hospitals) for the number of NPs it employed.

116.    Seeing the red flags, in the 4th quarter of 2018, HCA Chief Financial Officer Mike Marks of the National Group of HCA had a conference phone call with the Division and ORMC leadership to discuss the need for and function of the employed NPs since

ORMC had employed so many more NPs than comparable facilities.  During the call, Mr. Marks asked the specific question "Are any of these nurse practitioners providing history and physicals for your physicians at ORMC?"  The response from the ORMC Chief Nursing Officer (CNO) was "No." Mr. Marks stated, "That is good. We need to make sure the nurse practitioners are not providing services the physicians are billing for." When the call was over, Relator approached the CFO of ORMC after the meeting and stated, "this is wrong" and she stated, "I agree, but I am not going to say anything." The call with Mr. Marks would have been recorded pursuant to the Hospital Defendants' policies.

117.   On two separate occasions after this, Relator told the CFO of ORMC that it was wrong what Defendant HCA was doing with the NPs. The CFO's response was that Relator was leaving and please don't blow the whistle on this one.

118.   The response above is an example of the "culture" that exists at ORMC and Defendant HCA's North Florida Division as a whole. Increasing financial expectations were being placed on the leadership team at ORMC (especially in light of increasing competition). There was and still is a constant threat to one's employment if ORMC did not hit its escalating numbers (financial expectations). Fear and intimidation were and are still the common management techniques employed to quiet whistleblowers and perpetuate the financially rewarding fraud.

119.   The fraudulent NP scheme is also outlined and confirmed in an email from HCA Defendant VP of Neuroscience & Interventional Lab Sarabpreet Khara (sarabpreet.khara@HCAhealcare.com) to a neurologist at Neurological Services of Orlando, P.A., as well as on a recorded telephone conversation with HCA Defendant CFO

Mike Marks in 2018.

120.   As outlined above, Defendant HCA greatly profited from ORMC, which nearly tripled its EBIDA and grew to the second largest hospital in the HCA North Florida Division.

121.   The Defendants' non-compliance with the AKS, Stark Law and billing regulations were material and, had the Government Healthcare Plans known about the Defendants' material non-compliance, the plans would not have allowed reimbursement.

## COUNT I:
### Violation of the False Claims Act: Presenting False Claims for Payment
### 31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C.(a)(1)(A)

### (Illegal Kickbacks)
### (Billing for Services Not Rendered)
### (Stark Law Violations)

### (Against All Defendants)

122.   Relator incorporates by reference paragraphs 69-121 as if set forth fully here.

123.   Relator and the United States seek relief against all Defendants under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C. §3729(a)(1)(A).

124.   As set forth in detail above in paragraphs 70, 73, 109-110, and 73-121, as a result of the NP kickback scheme in violation of the federal AKS, 42 U.S.C. § 1320a-7b(b), which Defendants HCA, INC, Osceola Regional Hospital, Inc. d/b/a/ Osceola Regional Medical Center, North Florida Division I, Inc., Orange County Neurology Clinic, LLC (d/b/a Brain and Nerve Center, Orlando), Yassar Chakfe, M.D., Lake City Institute of Neurology, PA (d/b/a Florida Institute of Neurology – St. Cloud),  Naga Lakshmana P.

Nidadavolu, M.D., Neurology Consultants Central Florida, Inc., Abdul Mamsa, M.D., Neurological Health Associates, LLC, Fernando Gonzales-Portillo, M.D., S.A. Neurology, LLC, and Saif Ullah, M.D., Advanced Cardiology Specialists, PA, Salah Din, M.D., Milimir D. Arsov, M.D., Cardiac Clinic of Sunil M. Kakkar, M.D., Sunil M. Kakkar, M.D., Manoj K. Agrawal, M.D., Saqib A. Gowani, M.D., Sunil Kumar, M.D., Atul Madan, M.D., Padma K. Raju, M.D., Khurram Moin, M.D., Cardiovascular Associates, Inc., Johnson P. Massey, M.D., Patrick F. Mathias, M.D., Robert L. Barrett, M.D., Jooby John, M.D., Thomas Y. Kim, M.D., Mukesh Kumar, M.D., Naushad A. Shaik, M.D., James K. Warren, M.D., Cardiovascular Consultants Group, LLC (Kissimmee), Imran Bawaney, M.D., Florida Cardiology, PA (Orlando), Sayed T. Hussain, M.D., Roberto L. Torres-Aguiar, M.D., Usman R. Siddique, M.D., Giancarlo Speziani, M.D., Gowani Medical Associates, M.D., PLLC, Sherali H. Gowani, M.D., Health of Florida Cardiology, PA, Le Roi K. Price, M.D., Institute for Advanced Cardiovascular Care, LLC (Kissimmee), Aamir Javaid, M.D., Internal Medicine & Cardiology Associates, PA, Nasir I. Rahmatullah, M.D., M. Kalakota, M.D., PA, Madhusudana Kalakota, M.D., PriMed Healthcare, PA, Rafael Jimenez, M.D., Soleil Surgical, LLC and Julio Calderin, M.D., Defendants presented – or caused to be presented – claims for reimbursement to Government Healthcare Plans that were false or fraudulent.

125.    In addition, as set forth in detail above in paragraphs 70, 73, 109-110 and 114-121, as a result of the kickbacks which resulted in the presentation of claims to Government Healthcare Plans for services that were not provided and the presentation of claims to Government Healthcare Plans for services that were provided at ORMC

Comprehensive Stroke Center and Level 2 Trauma Center on patients who were there by virtue of the NP kickback scheme with Neurology and Vascular Surgeon Defendants that allowed for accreditation of these Centers, all Defendants presented – or caused to be presented – claims for reimbursement to Government Healthcare Plans that were false or fraudulent.

126.    In addition, as set forth in detail above in paragraphs 70, 73, 109-111 and 114-121, as a result of the Stark Law violations, all Defendants presented – or caused to be presented – claims for reimbursement to Government Healthcare Plans that were false or fraudulent.

127.    Accordingly, all Defendants knowingly presented false or fraudulent claims – or caused the presentment of false or fraudulent claims – for payment or approval in violation of 31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C. § 3729(a)(1)(A).

128.    By reason of the false or fraudulent claims that Defendants knowingly presented (or caused to be presented) to Medicare, Medicaid and other Government Healthcare Plans, the United States has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

129.    WHEREFORE, Relator respectfully requests that the Court enter judgment against all Defendants and in favor of the United States as follows:

> f.    that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this First Amended Complaint, as the False

Claims Act, 31 U.S.C. §§ 3729 et seq. provides;

g.      that civil penalties of $21,563 be imposed for each and every false claim that Defendants presented – or caused to be presented – to the United States and/or its grantees;

h.      that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

i.      that the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this First Amended Complaint;

j.      that Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act;

k.      that Relator be awarded the maximum amount allowed to him of any portion of a judgment or settlement fund that goes to any State government; and

l.      that this Court award such other and further relief as it deems proper.

## COUNT II:

### Violation of the False Claims Act: Use of False Statements
### 31 U.S.C. § 3729(a)(2) (2000), and, as amended, 31 U.S.C. § 3729(a)(1)(B)(Supp. 2009)

### (Illegal Kickbacks)
### (Billing for Services Not Rendered)
### (Stark Law Violations)

### (Against All Defendants)

130.    Relator incorporates by reference paragraphs 69-121 as if set forth fully here.

131.    Relator and the United States seek relief against all Defendants under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. § 3729(a)(2) and, as amended, 31 U.S.C. § 3729(a)(1)(B) (Supp. 2009).

132.    As set forth in detail above in paragraphs 70, 73, 109-110 and 114-121, as a result of the NP kickback scheme in violation of the federal AKS, 42 U.S.C. § 1320a-7b(b), which Defendants HCA, Osceola Regional Hospital, Inc. and North Florida Division I, Inc. paid and which was accepted by Defendants Orange County Neurology Clinic, LLC (d/b/a Brain and Nerve Center, Orlando), Yassar Chakfe, M.D., Lake City Institute of Neurology, PA (d/b/a Florida Institute of Neurology – St. Cloud),  Naga Lakshmana P. Nidadavolu, M.D., Neurology Consultants Central Florida, Inc., Abdul Mamsa, M.D., Neurological Health Associates, LLC, Fernando Gonzales-Portillo, M.D., S.A. Neurology, LLC, and Saif Ullah, M.D., Advanced Cardiology Specialists, PA, Salah Din, M.D., Milimir D. Arsov, M.D., Cardiac Clinic of Sunil M. Kakkar, M.D., Sunil M. Kakkar, M.D., Manoj K. Agrawal, M.D., Saqib A. Gowani, M.D., Sunil Kumar, M.D., Atul Madan, M.D., Padma K. Raju, M.D., Khurram Moin, M.D., Cardiovascular Associates, Inc., Johnson P. Massey,

M.D., Patrick F. Mathias, M.D., Robert L. Barrett, M.D., Jooby John, M.D., Thomas Y. Kim, M.D., Mukesh Kumar, M.D., Naushad A. Shaik, M.D., James K. Warren, M.D., Cardiovascular Consultants Group, LLC (Kissimmee), Imran Bawaney, M.D., Florida Cardiology, PA (Orlando), Sayed T. Hussain, M.D., Roberto L. Torres-Aguiar, M.D., Usman R. Siddique, M.D., Giancarlo Speziani, M.D., Gowani Medical Associates, M.D., PLLC, Sherali H. Gowani, M.D., Health of Florida Cardiology, PA, Le Roi K. Price, M.D., Institute for Advanced Cardiovascular Care, LLC (Kissimmee), Aamir Javaid, M.D., Internal Medicine & Cardiology Associates, PA, Nasir I. Rahmatullah, M.D., M. Kalakota, M.D., PA, Madhusudana Kalakota, M.D., PriMed Healthcare, PA, Rafael Jimenez, M.D., Soleil Surgical, LLC and Julio Calderin, M.D., Defendants made – or caused to be made – false records or statements that were material to getting false or fraudulent claims paid by Government Healthcare Plans.

133.   In addition, as set forth in detail above in paragraphs 70, 73, 109-110 and 114-121, as a result of the kickbacks which resulted in the presentation of claims to Government Healthcare Plans for services not provided and the presentation of claims to Government Healthcare Plans for services that were provided at ORMC Comprehensive Stroke Center and Level 2 Trauma Center on patients who were there by virtue of the NP kickback scheme with the Neurologist and Vascular Surgeon Defendants that allowed for accreditation of these Centers, all Defendants made – or caused to be made – false records or statements that were material to getting false or fraudulent claims paid by Government Healthcare Plans.

134.   In addition, as set forth in detail above in paragraphs 70, 73, 109-110, 104-

111 and 114-121, as a result of the Stark Law violations, all Defendants made – or caused to be made – false records or statements that were material to getting false or fraudulent claims paid by Government Healthcare Plans.

135.   More specifically, first, Defendants falsely certified, stated, and/or represented that the reimbursements they sought for cardiology, neurology and vascular surgeon initial consultation and follow up services were in full compliance with applicable federal and state laws prohibiting fraudulent and false reporting, including but not limited to the federal AKS, 42 U.S.C. § 1320a-7b(b) and, with respect to the Neurology Defendants, Cardiology Defendants and Vascular Surgeon Defendants, the requirement that a physician – and not a NP employed by a third party – is actually providing the services for which the physician is billing the Government Healthcare Plans. Defendants' false certifications, statements, or representations caused Government Healthcare Plans to pay out sums to Defendants that would not have been paid if those programs had been made aware of the falsity of the Defendants' certifications, statements, or representations.

136.   Second, the Hospital, Neurology and Vascular Surgeon Defendants falsely certified, stated, and/or represented that the reimbursements they sought for neurology and vascular surgeon services provided at ORMC Comprehensive Stroke Center and Level 2 Trauma Center were in full compliance with applicable federal and state laws, including but not limited to the federal AKS, 42 U.S.C. § 1320a-7b(b), which prohibits paying remuneration to physicians to induce business reimbursed under the Government Healthcare Plans. The NP kickback scheme induced the Neurologist and Vascular Surgeon Defendants to affiliate with ORMC and allowed ORMC to get and maintain accreditation

of these Centers where the Neurologist and Vascular Surgeon Defendants performed services that generated claims for reimbursement from the Government Healthcare Plans. The Hospital, Neurologist and Vascular Surgeon Defendants' false certifications, statements, or representations caused Government Healthcare Plans to pay out sums to these Defendants that would not have been paid if those programs had been made aware of the falsity of these Defendants' certifications, statements, or representations.

137.    Accordingly, Defendants knowingly used – or caused the use of – false records or statements material to false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B).

138.    By reasons of these false records or statements that Defendants used (or caused to be used), the United States has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

139.    WHEREFORE, Relator respectfully requests that the Court enter judgment against all Defendants and in favor of the United States as follows:

m.    that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this First Amended Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 et seq. provides;

n.    that civil penalties of $21,563 be imposed for each and every false claim that Defendants presented – or caused to be presented – to the United States and/or its grantees;

o.      that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

p.      that the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this First Amended Complaint;

q.      that Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act;

r.      that Relator be awarded the maximum amount allowed to him of any portion of a judgment or settlement fund that goes to any State government; and

s.      that this Court award such other and further relief as it deems proper.

## COUNT III
### Violation of the False Claims Act: Conspiring to Violate the False Claims Act
### 31 U.S.C. § 3729(a)(3) (1986), and, as amended, 31 U.S.C. § 3729(a)(1)(C)

### (Conspiracy Against All Defendants)

140.   Relator incorporates by reference paragraphs 69-121 as if set forth fully here.

141.   Relator and the United States seek relief against Defendants under Section 3729(a)(3) of the False Claims Act, 31 U.S.C. § 3729(a)(3)(1986) and, as amended, 31 U.S.C. § 3729(a)(1)(C).

142.   A conspiracy violation of the FCA occurs when a person "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)" of the FCA.  31 U.S.C.

§ 3729(a)(1)(C).

143.    As set forth in detail above in paragraphs 70, 73, 109-110 and 114-121, Relator alleges that Defendants entered into an agreement and plan to conspire to violate the FCA through their company policies and practices, which were devised, perpetuated and implemented by Defendants.

144.    As outlined above, the fraudulent company practices that Defendants conspired to violate included engaging in an illegal kickback scheme whereby Defendants HCA, Osceola Regional Medical, Inc. and North Florida Division I, Inc. provided NPs to the Neurology Defendants, Cardiology Defendants and Vascular Surgeon Defendants in exchange for mutual benefits to all Defendants, as outlined above in paragraphs 70, 73, 109-110 and 114-121.

145.    As outlined above, the fraudulent company practices that Defendants conspired to violate also included the presentment of claims to Government Healthcare Plans for services that were not provided and for services that were provided at ORMC Comprehensive Stroke Center and Level 2 Trauma Center on patients who were there by virtue of the NP kickback scheme with Neurology and Vascular Surgeon Defendants that allowed for accreditation of these Centers, as outlined above in paragraphs 70, 73 and 109-121.

146.    As outlined above, the fraudulent company practices that Defendants conspired to violate also included a referral of patients to Defendants HCA, Osceola Regional Medical, Inc., and North Florida Division I, Inc., in which the Neurology Defendants, Cardiology Defendants and Vascular Surgeon Defendants had a financial

interest, as outlined above in paragraphs 70, 73, 109-110 and 114-121.

147. As set forth throughout the First Amended Complaint, these Co-Defendants and Co-Conspirators agreed verbally and in writing to commit acts in furtherance of these fraudulent business operations and took actions in furtherance of their conspiracy.

148. The conspiracy of these Co-Defendants and Co-Conspirators caused the submission of false and fraudulent claims to Government Healthcare Plans seeking reimbursement for products tainted by the fraudulent schemes devised, perpetuated and implemented by all Defendants.

149. Accordingly, Defendants conspired to defraud the United States by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(3)(1986) and conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B), in violation of 31 U.S.C. § 3729(a)(1)(C) (2009).

150. By reason of the false or fraudulent claims and Defendants' actions taken in furtherance of their conspiracy to get paid by reasons of their conspiracy to violate 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B), the United States has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

WHEREFORE, Relator respectfully requests that the Court enter judgment against all Defendants and in favor of the United States as follows:

        t.    that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this First Amended Complaint, as the False

Claims Act, 31 U.S.C. §§ 3729 et seq. provides;

u.     that civil penalties of $21,563 be imposed for each and every false claim that Defendants presented – or caused to be presented – to the United States and/or its grantees;

v.     that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

w.     that the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this First Amended Complaint;

x.     that Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act;

y.     that Relator be awarded the maximum amount allowed to him of any portion of a judgment or settlement fund that goes to any State government; and

z.     that this Court award such other and further relief as it deems proper.

**COUNT IV**
**Violation of the Florida False Claims Act**
**FLA STAT § 68.081, *et seq.***

**(Illegal Kickbacks)**
**(Billing For Services Not Rendered)**
**(Conspiracy to Commit Fraud)**

**(Against All Defendants)**

151.   Relator incorporates by reference paragraphs 69-121 as if set forth fully here.

152.    Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

153.    The Florida Medicaid system is jointly funded by the federal and state governments.

154.    Under the Florida False Claims Act, FLA STAT §68.082 (2), "Any person who:

(a)    Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b)    Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(c)    Conspires to commit a violation of this subsection;

...

(g)    Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state;

is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the state sustains because of the act of that person."

155.    Defendants presented or caused to be presented a false or fraudulent claim for payment, used or caused to be used a false record or statement material to a false or

53

fraudulent claim, conspired to commit a violation of the Florida False Claims Act and/or used or caused to be used a false record or statement material to an obligation to pay or transmit money or property to the State of Florida.

156.   As set forth above in paragraphs 70, 73, 109-110 and 114-121, those claims were false in that they were tainted by kickbacks and were for services not actually performed by physicians or the physicians' NPs. In addition, the Hospital, Neurologist and Vascular Surgeon Defendants submitted false claims for services tainted by kickbacks in that they were performed on ORMC Comprehensive Stroke Center and Level 2 Trauma Center patients who were there by virtue of the NP kickback scheme with Neurology and Vascular Surgeon Defendants that allowed for accreditation of these Centers.

157.   Under the Florida False Claims Act, FLA STAT §68.082 (2), Defendants are liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the state sustains because of the act of that person.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendants and in favor of the United States/State of Florida as follows:

aa.   that the United States/State of Florida be awarded damages in the amount of three times the damages sustained by them because of the false claims alleged within this First Amended Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 et seq. and the Florida False Claims Act, FLA STAT §68.082 (2).

bb.   that civil penalties of $21,563 be imposed for each and every false claim that Defendants presented – or caused to be presented or

conspired to present – to the United States (Florida Medicaid) and/or its grantees;

cc.     that civil penalties of $5,500-$11,000 be imposed for each and every false claim that Defendants presented – or caused to be presented or conspired to present – to the State of Florida and/or its grantees;

dd.     that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

ee.     that the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act and/or the Florida False Claims Act for which redress is sought in this First Amended Complaint;

ff.     that Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act and the Florida False Claims Act;

gg.     that Relator be awarded the maximum amount allowed to him of any portion of a judgment or settlement fund that goes to any other State government

### Demand for Jury Trial and Designation of Place of Trial

Relator, on behalf of the United States, and on behalf of himself, hereby demands a trial by jury on all counts and allegations of wrongful conduct alleged in this First Amended Complaint in the United States District Court for the Middle District of Florida.

Dated: February 25, 2021

Respectfully submitted,

Larry A. Golston, FL # 0483044
C. Lance Gould, AL # ASB-0913-G66C
Tyner D. Helms, AL # ASB-2016-L14E
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
P. O. Box 4160
Montgomery, AL 36103-4160
Tel: (334) 269-2343
Fax: (334) 954-7555
Larry.Golston@BeasleyAllen.com
Lance. Gould@BeasleyAllen.com
Tyner.Helms@BeasleyAllen.com

Carrie M. Brous, KS #18157
Brous Law LLC
3965 West 83rd Street, Ste. #115
Prairie Village, KS 66208
Tel: (913) 209-8596
cbrous@brouslaw.com

Harold L. 'Tripp' Sebring, III.
Sebring Law
1509 E. 9th Avenue
Tampa, FL 33605
Tel: (813) 227-7777
Fax: (813) 443-5252
Tripp@SebringLaw.net

*ATTORNEYS FOR PLAINTIFF/RELATOR*